**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

KENNETH E. KAUMANS,       :
                               :
             **Plaintiff**      :     **CIVIL ACTION NO. 3:11-CV-01404**
                               :
        **vs.**            :     **(Complaint Filed 7/29/2011)**
                               :
MICHAEL J. ASTRUE,       :
COMMISSIONER OF SOCIAL    :         **(Judge Caputo)**
SECURITY,                  :
                               :
          **Defendant**    :

## MEMORANDUM

## BACKGROUND

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Kenneth E. Kaumans's claim for social security disability insurance benefits.

On July 20, 2009, Kaumans filed protectively[1] an application for disability insurance benefits. Tr. 10, 27, 54 and 129.[2] The application was initially denied by the Bureau of Disability Determination[3] on February 23, 2010. Tr. 56-60. On March 8, 2010, Kaumans requested a hearing before an administrative law judge. Tr. 10 and 61-62. After

_____

[1]Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

[2]References to "Tr._" are to pages of the administrative record filed by the Defendant as part of his Answer on September 30, 2011.

[3]The Bureau of Disability Determination is a state agency which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration. Tr. 57.

about 10 months had elapsed, a hearing was held on January 3, 2011. Tr. 25-46. On March 7, 2011, the administrative law judge issued a decision denying Kaumans's application. Tr. 10-20. On April 1, 2011, Kaumans filed a request for review with the Appeals Council and on June 7, 2011, the Appeals Council concluded that there was no basis upon which to grant Kaumans's request. Tr. 1-6 and 102. Kaumans was not represented by counsel during the administrative proceedings.

Kaumans then obtained counsel and filed a complaint in this court on July 29, 2011. Supporting and opposing briefs were submitted and the appeal[4] became ripe for disposition on December 27, 2011, when Kaumans filed a reply brief.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." It is undisputed that Kaumans meets the insured status requirements of the Social Security Act through December 31, 2012. Tr. 10, 112, 123 and 129.

Kaumans, who was born in the United States on January 19, 1961, withdrew from secondary school in 1977 after completing the 9th grade. Tr. 32-33, 115, 139 and 353. Testing when Kaumans was attending school revealed that he had a learning disability. Tr. 170. During his schooling he attended special education classes. Tr. 139. Kaumans attempted to obtain a General Equivalency Diploma but failed the test, even though he had

---

[4]Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D.Pa. Local Rule 83.40.1.

a tutor. Tr. 33 and 337

Kaumans has past relevant employment[5] as a tile helper which was described by a vocational expert as unskilled, very heavy work, and as a boiler room operator described as skilled, medium work. Tr. 43-44 and 134. [6] Records of the Social Security

---

[5]Past relevant employment in the present case means work performed by Kaumans during the 15 years prior to the date his claim for disability was adjudicated by the Commissioner. 20 C.F.R. §§ 404.1560 and 404.1565.

[6]The terms sedentary, light, medium, heavy and very heavy work are defined in the regulations of the Social Security Administration as follows:

> (a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

> (b) *Light work*. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

> (c) *Medium work*. Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can do sedentary and light work.

Administration reveal that Kaumans had earnings spanning the  years 1977 through 2007
as follows;

| | |
|---|---|
| 1977 | $   667.59 |
| 1978 | 699.62 |
| 1979 | 1148.45 |
| 1980 | 1253.95 |
| 1981 | 1819.06 |
| 1982 | 1239.50 |
| 1983 | 1848.60 |
| 1984 | 4065.76 |
| 1985 | 3081.99 |
| 1986 | 7774.30 |
| 1988 | 10577.05 |
| 1988 | 14215.75 |
| 1989 | 7178.31 |
| 1990 | 10739.61 |
| 1991 | 3426.88 |
| 1992 | 10786.14 |
| 1993 | 9368.50 |
| 1994 | 12272.16 |
| 1995 | 13915.29 |
| 1996 | 14612.05 |
| 1997 | 14512.52 |
| 1998 | 16635.78 |
| 1999 | 19116.99 |

(d) *Heavy work*.  Heavy work involves lifting no more
than 100 pounds at a time with frequent lifting or
carrying of objects weighing up to 50 pounds. If
someone can do heavy work, we determine that he
or she can also do medium, light, and sedentary work.

(e) *Very heavy work*.  Very heavy work involves lifting
objects weighing more than 100 pounds at a time with
frequent lifting or carrying of objects weighing 50
pounds or more.  If someone can do very heavy work, we
determine that he or she can also do heavy, medium,
light and sedentary work.

20 C.F.R. § 404.1567.

| | |
|---|---|
| 2000 | 19750.79 |
| 2001 | 18972.52 |
| 2002 | 18559.25 |
| 2003 | 17386.47 |
| 2004 | 26107.77 |
| 2005 | 30870.80 |
| 2006 | 30198.18 |
| 2007 | 26467.93 |

Tr. 124.  Kaumans's total earnings during those years were $369,269.20. Id.

Kaumans alleges that he became disabled on April 30, 2009,  because of both physical and psychiatric problems, including diabetes and depression.  Tr. 133.  Kaumans has not worked since April 30, 2009.   Id.

Because there were legal errors committed during the administrative proceedings we will remand this case to the Commissioner for further consideration.

**STANDARD OF REVIEW**

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner.  See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin.,  181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence."  Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704

(3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the

Commissioner must scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

Another critical requirement is that the Commissioner adequately develop the record.  Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000)("The ALJ has an obligation to develop the record in light of the non-adversarial nature of benefits proceedings, regardless of whether the claimant is represented by counsel."); Rutherford v. Barnhart, 399 F.3d 546, 557 (3d Cir. 2005); Fraction v. Bowen, 787 F.2d 451, 454 (8th Cir. 1986); Reed v. Massanari, 270 F.3d 838, 841 (9th Cir. 2001); Smith v. Apfel, 231 F.3d 433. 437 (7th Cir. 2000);  see also Sims v. Apfel, 530 U.S. 103, 120 S.Ct. 2080, 2085 (2000)("It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits[.]").  If the record is not adequately developed, remand for further proceedings is appropriate.  Id.

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).  Furthermore,

> [a]n individual shall be determined to be under a
> disability only if his physical or mental impairment
> or impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work experience,
> engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of
> whether such work exists in the immediate area in which
> he lives, or whether a specific job vacancy exists for
> him, or whether he would be hired if he applied for
> work.  For purposes of the preceding sentence (with

7

respect to any individual), "work which exists in the
national economy" means work which exists in significant
numbers either in the region where such individual
lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance claims.  See 20 C.F.R. §404.1520; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[7] (2) has an impairment that is severe or a combination of impairments that is severe,[8] (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[9] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national

---

[7]If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further.

[8] The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id.  If a claimant has any severe impairments, the evaluation process continues.  20 C.F.R. § 404.1520(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process.  20 C.F.R. §§ 404.1523 and 404.1545(a)(2).

[9]If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

economy. Id.  As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[10]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities.  Id; 20 C.F.R. § 404.1545; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**MEDICAL RECORDS**

Before we address the administrative law judge's decision and the arguments of counsel, we will review some of Kaumans's medical records.

The medical records reveal that Kaumans was treated for both physical and psychiatric problems.   Kaumans was treated, inter alia, for diabetes with peripheral neuropathy impacting the lower extremities, high blood pressure, gastrointestinal problems, major depression and anxiety.  At the administrative hearing held on January 3, 2011, Kaumans testified that he had numbness from his knees to his feet, stabbing pain, and feeling like his feet are frostbitten. Tr. 35-37. He indicated that the neuropathy limits his ability to be on his feet. Id.  Kaumans further testified that he felt tired and depressed, which his medications made worse. Tr. 36, 41 and 43.

_____

[10]If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

On February 21, 2008, Kaumans was treated at the emergency department of the Chambersburg Hospital, Chambersburg, Pennsylvania, for nausea, vomiting and diarrhea. Tr. 177-178. The diagnosis was that Kaumans suffered from acute gastroenteritis with uncontrolled diabetes. Id. Kaumans was examined and discharged the same day. Id. At discharge he was instructed to follow-up with his treating physician, H. Frederick Martin, M.D.,[11] "if no better in 4 days or sooner if worse." Id. It was noted that Kaumans's current medications were Glucophage,[12] Protonix,[13] enalapril[14] and Glucotrol.[15] Id.

During 2008 Kaumans was treated for diabetes at Mission of Mercy in Gettysburg, Pennsylvania, on several occasions. Tr. 244-256. Mission of Mercy is an non-profit organization that provides free health care, free dental care and free prescription medications to the uninsured and under-insured. Clinics are located in Arizona, Maryland

---

[11]  Dr. Martin is is a graduate of Jefferson Medical College and was Board Certified in Family Medicine in 1983. He is affiliated with the Gettysburg Hospital and Wellspan Health. Wellspan Health, http://physicians.wellspan.org/PhysicianProfile .asp?drlink='100240' (Last accessed November 9, 2012).

[12]"Glucophage (metformin) is an oral diabetes medicine that helps control blood sugar levels." Glucophage, Drugs.com, http://www.drugs.com/glucophage.html (Last accessed November 15, 2012).

[13]"Protonix [pantoprazole] is in a group of drugs called proton pump inhibitors. It decreases the amount of acid produced in the stomach. Protonix is used to treat esophagitis (damage to the esophagus from stomach acid[.]" Protonix, Drugs.com, http://www.drugs.com/protonix.html (Last accessed November 15, 2012).

[14] "Enalapril [Vasotec] is used to treat high blood pressure (hypertension) and congestive heart failure." Enalapril, Drugs.com, http://www.drugs.com/enalapril.html (Last accessed November 15, 2012).

[15]"Glucotrol (glipizide) is an oral diabetes medicine that helps control blood sugar levels." Glucotrol, Drugs.com, http://www.drugs.com/glucotrol.html (Last accessed November 15, 2012).

Pennsylvania and Texas. The administrative record reveals that Kaumans was treated at Mission of Mercy on the following dates: January 17, March 13, July 17, September 4, October 30, and December 18, 2008. Tr. 244-252. The records further indicate that Kaumans was being treated for diabetes with neuropathy, high blood pressure and gastroesophageal reflux disease. Id.

On January 21, 2009, Kaumans was voluntarily admitted to the Roxbury Treatment Center ("Roxbury"), Shippensburg, Pennsylvania, because of depression and suicidal ideations.[16] Tr. 180-210 and 226.[17] The psychiatrist who treated Kaumans at Roxbury was Fauzia Sheikh, M.D. Id. After an initial evaluation at Roxbury, Kaumans was taken to the Gettysburg Hospital for a physical examination and diagnostic tests, including blood tests.[18] Tr. 180 and 281-285. After being examined at the Gettysburg Hospital he

---

[16]Roxbury is an inpatient behavioral health facility providing psychiatric, chemical dependency and substance abuse treatment as well as mental health treatment for active duty military personnel. Roxbury Treatment Center, http://www.roxburyhospital.com/ (Last accessed November 9, 2012).

[17]The record of the discharge summary from Roxbury contained within the administrative record was out of order. The first page of the discharge summary was at page 180 and the second page of the discharge summary was at page 226 of the administrative record.

[18]One of the blood tests was an HgbA1C test which was high at 8.1 revealing that Kaumans's diabetes was not under control. Tr. 224. The HgbA1C or A1C blood test is a test that measures the amount of glycated hemoglobin or glycohemoglobin in the blood. It is used to monitor the control of diabetes mellitus. Glycohemoglobin is hemoglobin to which glucose is bound. Glucose stays attached to hemoglobin for the life of the red blood cells, 120 days. A1C reflects the average blood glucose and gives a good estimate of how well an individual manages his or her diabetes over the prior 2 to 3 months. The normal A1C level is 7% according to the American Diabetes Association and 6.5% according to the American Association of Clinical Endocrinologists. An A1C level of 8% translates to an estimated average glucose of 183. American Diabetes Association, Estimated Average Glucose, http://www.diabetes.org/living-with-diabetes/treatment-and-care/blood-glucose -control/estimated-average-glucose.html (Last accessed November 9, 2012). Normal

11

returned to Roxbury. Id.

At Roxbury it was observed that Kaumans "present[ed] with a disheveled appearance, depressed mood, and flat affect" but "had fair eye contact" and "was oriented to person, time, [place] and situation." Tr. 180. The diagnosis upon admission at Roxbury was major depressive disorder, recurrent; rule out impulse control disorder, not otherwise specified; rule out dysthymia and double depression;[19] and a mild learning disability. Tr. 197. Kaumans was given a Global Assessment of Functioning (GAF) score of 15-20.[20] Id.

---

fasting blood glucose is 70-99 and normal blood glucose 2 hours after eating is 70-145. Diabetes Health Center, Blood Glucose, WebMd, http://diabetes.webmd.com/blood-glucose?page=3 (Last accessed November 9, 2012).

[19] The "Rule out" diagnosis is problematic. It can mean either the practitioner ruled the condition out, that is the individual does not suffer from that condition, or it can mean that the practitioner cannot definitively diagnose a patient with a particular illness because all of the criteria for that illness have not been met but the practitioner is of the opinion that the patient is on the borderline of that illness and the diagnosis calls for a ruling out or confirming of the illness in a future diagnosis. See http://www.throughtheeyes.org/files/the_axes_of_a_diagnosis.pdf (Last accessed November 15, 2012); http://everything2.com/title/DSM-IV+diagnosis (Last accessed November 15, 2012).

[20]The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 3–32 (4th ed. 1994). A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. Id. The score is useful in planning treatment and predicting outcomes. Id. The GAF rating is the single value that best reflects the individual's overall functioning at the time of examination. The rating, however, has two components: (1) symptom severity and (2) social and occupational functioning. The GAF is within a particular range if either the symptom severity or the social and occupational level of functioning falls within that range. When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the worse of the two. Thus, a suicidal patient who is gainfully employed would have a GAF rating below 20. A GAF score of 21-30 represents behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas. A GAF score of 31-40 represents some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. Id. A GAF score of 41-50 indicates serious

Kaumans stayed at Roxbury until he was discharged on January 23, 2009. Tr. 180 and 226. At discharge Kaumans "denied suicidal or homicidal ideations or hallucinations" and "verbalized an understanding of his after care plan." Tr. 226.  The discharge diagnosis was that Kaumans suffered from major depressive disorder, recurrent; rule out impulse control disorder, not otherwise specified; rule out dysthymia and double depression; and a mild learning disability. Id.  He was given a GAF score of 55-60, representing a moderate psychiatric impairment.   The discharge plan was for Kaumans to follow-up with Mission of Mercy in Gettysburg for medication management and for therapy at Adams-Hanover Counseling Services, Inc. ("Adams-Hanover"), located in Hanover, Pennsylvania. Id.  It was noted that Kaumans would have an appointment with Dr. Martin, his primary care physician on February 7, 2009. Id.   Kaumans's medications at discharge were Protonix, aspirin, enalapril, HCTZ (hydrochlorothiazide),[21] metformin, glipizide, Neurontin(generic gabapentin) and nortriptyline.[22]   Tr. 182.

The record reveals that Kaumans was treated at Mission of Mercy on June 11, July 23 and August 27,  2009. Tr. 254-256.  The record from August 27, 2009,   indicates that Kaumans was suffering from depression and was prescribed amitriptyline  (brand name

---

symptoms or any serious impairment in social, occupational or school functioning.  Id.  A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. Id. A GAF score of 61 to 70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships. Id.

[21]HCTZ is a diuretic used to treat high blood pressure.  HCTZ, Drugs.com, http://www.drugs.com/hctz.html (Last accessed November 15, 2012).

[22]"Nortriptyline is used to treat symptoms of depression." Nortriptyline, Drugs.com, http://www.drugs.com/nortriptyline.html (Last accessed November 15, 2012).

Elavil).[23]  Tr. 256.   Also, there are medical records from Dr. Martin dated October 15, 2008 and February 7 and 21, March 30, April 1, May 18,  June 27, July 17, August 12 and September 9, 2009 which indicate that Kaumans was treated for diabetes, high blood pressure and depression. Tr. 264-279.   A record from April 1, 2009, reveals that Kaumans was on the medication Neurontin which is used to treat neuropathy and the medication amitriptyline used to treat depression. Tr.  265.

Kaumans was admitted to the Gettysburg Hospital on April 2, 2009, for observation and discharged on April 3, 2009.  Tr. 293-301.  He was diagnosed with hyponatremia,[24] type 2 diabetes and acute gastroenteritis. Id.   The record of this hospitalization reveals that at the time Kaumans was on the following medications: Protonix, enalapril, metformin, Neurontin, aspirin, hydrochlorothiazide, glipizide and nortriptyline. Id.

A medical record dated July 14, 2009, reveals that Kaumans was prescribed the following medications: Protonix, aspirin, enalapril, hydrochlorothiazide, metformin, glipizide and nortriptyline and was suffering from diabetes, high blood pressure, gastroesophageal reflux disease and a history of depression and nervous breakdown.  Tr. 239-240.

On July 29, 2009, Kaumans underwent a neuropsychological evaluation by

---

[23]"Amitriptyline is a trycyclic antidepressant . . . [It] is used to treat symptoms of depression." Amitriptyline, Drugs.com, http://www.drugs.com/amitriptyline.html (Last accessed November 15, 2012).

[24]"Hyponatremia" is defined as "deficiency of sodium in the blood."  Dorland's Illustrated Medical Dictionary, 903 (32nd Ed. 2012).

Sheree Contres, Psy.D., a licensed psychologist and clinical neuropsychologist,[25] at Brownstone Psychological Services, Manchester, Pennsylvania. Tr. 228-233. After conducting a clinical interview and mental status examination of Kaumans and administering a battery of psychological, neuropsychological and intelligence tests to Kaumans, Dr. Contres concluded that Kaumans had a Full Scale IQ of 94 placing him in the lower limits of the average range of intelligence. Tr. 229. Dr. Contres noted that Kaumans exhibited a depressed mood and variable affect, and reported thoughts of killing himself, which he indicated he would not do. Tr. 229. Dr. Contres found that Kaumans's neurocognitive processes were impaired for problem solving, mental flexibility, and localization. Dr. Contres opined that he should not be placed in a position where he had to make decisions that impacted himself or others, he is limited to routine tasks, and does better with repetition. She determined he also needs to be kept on the subject at hand because of difficulty with his ability to stay focused to the task. She confirmed his diagnosis of major depression and gave him a GAF score of 48, representing a severe psychological impairment. Tr. 232-233.

On August 20, 2009, Kaumans visited the emergency department at the Gettysburg Hospital complaining of nausea and vomiting. Tr. 305-306. He was diagnosed as suffering from acute gastritis and gastroenteritis. Id.

Kaumans visited the emergency department at the Gettysburg Hospital on August 23, 2009, and was found to be suffering from hypoglycemia, low blood sugar. Tr. 312.

On September 14, 2009, Kaumans visited the emergency department at the

---

[25]The record further reveals that Dr. Contres is a certified school psychologist and a Diplomate of the American Board of Neuropsychology. Tr. 233.

Gettysburg Hospital complaining of anxiety. Tr. 314. The attending physician's diagnosis was anxiety and Kaumans was prescribed the medication Ativan.[26] Tr. 315.

On October 27, 2009, Michael Suminski, Ph.D., a psychologist, reviewed Kaumans's medical records on behalf of the Bureau of Disability Determination. Tr. 317-333. Dr. Suminski found that Kaumans suffered from a learning disability and major depressive disorder. Tr. 319. Dr. Suminski further found that Kaumans had moderate difficulties in maintain concentration, persistence or pace; and Kaumans had moderate limitations in his ability to carry out detailed instructions, accept instructions and respond appropriately to criticism from supervisors, and respond appropriately to changes in the work setting. Tr. 317-318 and 331. Dr. Suminski concluded that Kaumans was "able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from his impairments." Tr. 320. Dr. Suminski did not conduct a clinical interview of Kaumans but merely reviewed the medical records.

After Dr. Suminski opined that Kaumans had the mental capacity to engage in competitive work, Kaumans on December 23, 2009, received treatment from Michael Sullivan, M.D.,[27] at Mission of Mercy in Gettysburg. Tr. 374. Dr. Sullivan's patient progress notes of this appointment are difficult to decipher. Id. We can discern that Dr. Sullivan did

---

[26] "Ativan (lorazepam) is in a group of drugs called benzodiazepines . . . [It] is used to treat anxiety disorders." Ativan, Drugs.com, http://www.drugs.com/ativan.html (Last accessed November 15, 2012).

[27] Dr. Sullivan is a graduate of the University of Nebraska Medical School and Board Certified in Internal Medicine. He has been practicing medicine since 1975 and is affiliated with the Gettysburg Hospital and Wellspan Health. Wellspan Health, http://content.wellspan.org/search/default.aspx?cx=009851497422398450697%3Azbbsm4oohsa&cof=FORID%3A11%3BNB%3A1&ie=UTF-8&q=Michael+Sullivan&sa.x=31&sa.y=6 (Last accessed November 9, 2012).

prescribe the medication amitriptyline and diagnosed Kaumans as suffering from insulin-dependent diabetes mellitus (IDDM) with neuropathy. Id.  There was one other medication prescribed by Dr. Sullivan but we are unable to decipher his handwriting. Id.  However, at the top of the patient progress note it is stated (in a different handwriting most likely by a nurse or physician's assistant) that Kaumans needed refills of enalapril, metformin, glipizide, amitriptyline and Neurontin. Id.

On December 23, 2009, Dr. Sullivan completed a document on behalf of Kaumans which related to a state court child support proceeding.  Tr. 366. In that document Dr. Sullivan stated that Kaumans was "continuously disabled (unable to work)" from April, 2009 through April, 2010. Id.   Dr. Sullivan stated that Kaumans's disabling impairments were high blood pressure, anxiety, depression, left sacroiliac strain and diabetes mellitus. Id.  Dr. Sullivan noted that he first treated Kaumans on December 18, 2008. Id.   However, Dr. Sullivan oddly indicated that the latest appointment with Kaumans was on December 23, 2008.  We conclude that Dr. Sullivan meant to indicate December 23, 2009, in light of  Dr. Sullivan's patient progress notes of December 23, 2009, which we reviewed above. Tr. 374.

On February 3, 2010, Kaumans was examined by Jeffrey Nolt, M.D., on behalf of the Bureau of Disability Determination. Tr. 336-342.   Dr. Nolt conducted a review of Kaumans's medical history and medications and performed a clinical interview. Id.  The results of a physical examination revealed that Kaumans was unable to bend or stoop to the floor to pick up anything effectively; he had decreased monofilament test in his lower extremities and there was a little bit of blister on the right big toe; and his left shoulder revealed decreased range of motion. Id.   Dr. Nolt concluded that Kaumans suffered from

type 2 diabetes with complications including diabetic neuropathy[28] and possibly diabetic nephropathy;[29] back pain, probably musculoskeletal; possible coronary artery disease; and depression. Tr. 339. Dr. Nolt concluded that Kaumans could frequently lift and carry 10 pounds and occasionally lift 20 pounds; stand and walk 1 hour or less during an 8-hour workday; sit 8 hours with alternating sitting/standing at will; and pushing and pulling limited to the lifting and carrying capacity. Tr. 341. Dr. Nolt found that Kaumans could occasionally bend and kneel but never stoop, crouch, balance or climb. Tr. 342.

Kaumans was treated at Mission of Mercy in Gettysburg on February 17, April 28, June 30, August 25, and October 20, 2010. Tr. 375-379. The patient progress notes of those appointments reveal that Kaumans was repeatedly diagnosed as suffering from diabetes mellitus with neuropathy and high blood pressure and was prescribed the medications enalapril, metformin, glipizide, Protonix, amitriptyline and Neurontin. Id.

On December 22, 2010, Dr. Sullivan completed a document on behalf of Kaumans entitled "Medical Source Statement of Ability to Do Work-Related Activities (Physical)." Tr. 380-385. In that document Dr. Sullivan limited Kaumans to less than full-time sedentary work. Id. He stated that Kaumans could only occasionally lift and/or carry

---

[28]Diabetic neuropathy is damage to the nerves in the body caused by high blood sugar levels. Diabetic neuropathy, A.D.A.M. Medical Encyclopedia, U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001713/ (Last accessed November 15, 2012). Symptoms of this condition include nausea, constipation, diarrhea, vomiting, and tingling, burning or pain in the arms, legs and feet. Id.

[29]Diabetic nephropathy is kidney disease or damage that can occur in people with diabetes. Diabetes and kidney disease, A.D.A.M. Medical Encyclopedia, U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001524/ (Last accessed November 15, 2012). Symptoms of this condition include fatigue, general ill feeling, headache, and nausea and vomiting. Id.

10 pounds; he could only sit 3 hours, stand 2 hours and walk 1 hour at one time without interruption; in an 8-hour workday he could only sit for a total of 3 hours, stand 2 hours and walk 1 hour; he could never climb stairs, ramps, ladders or scaffolds and never balance, stoop, kneel, crouch and crawl; he could never tolerate exposure to unprotected heights, moving mechanical parts, and vibrations; and he could not walk a block at a reasonable pace on rough or uneven surfaces. Id.  Dr. Sullivan further stated that these limitations first appeared in 2006 and have lasted or will last for a period of 12 consecutive months. Tr. 385.

Dr. Sullivan also on December 22, 2010, completed on behalf of Kaumans a document entitled "Medical Source Statement of Ability to Do Work-Related Activities (Mental)." Tr. 387-389.   In that document Dr. Sullivan stated that Kaumans had moderate limitations in his ability to make judgment on simple work-related decisions, understand and remember complex instructions, make judgment on complex work-related decisions, interact appropriately with supervisors and co-workers, and respond appropriately to usual work situations and to changes in a routine work setting. Id.   Dr. Sullivan further found that Kaumans had a marked limitation in his ability to carry out complex instructions. Id.

 Kaumans received treatment for his mental health conditions at Adams-Hanover.  Tr. 352-359.  He was initially evaluated at Adams-Hanover on January 13, 2010, by two psychiatrist,  Ray C. Davis, M.D., and Edward Coronado, M.D.  Tr. 352-354.[30]  After

---

[30]The report of this evaluation indicates that Kaumans was referred to Adams-Hanover by "his therapist Tracey Lamandella (sic) in Gettysburg for an evaluation of depression."  Tr. 352.  The Social Security Administration sent a request to Ms. LaMendola for Kaumans's therapy records on November 1, 2010. Tr. 361.  Ms. LaMendola responded by stating as follows: "I received the request for medical/therapy records . . . I am his Mental Health Resource Coordinator with York Adams Mental Health Mental Retardation. We do not do testing or evaluations at this agency.  Kenneth receives individual therapy and medication management with a Psychiatrist at [Adams-Hanover]. Adams Hanover

conducting a clinical interview and a mental status examination, Dr. Davis and Dr. Coronado concluded that Kaumans suffered from major depression and gave him a GAF score of 45, representing serious symptoms. Id.   During the mental status examination, the two psychiatrists noted that Kaumans appeared older that his stated age; he was very circumstantial and had to be redirected on numerous occasions; he had loud speech but it was normal in rate and rhythm; and his mood ranged "from irritable to sad, to smile." Id.

On February 4 and April 30, 2010, Kaumans was prescribed the antidepressant medication amitryptyline by Adams-Hanover. Tr. 358

On July 23, 2010, Dr. Coronado completed a document on behalf of Kaumans entitled "Employability Assessment Form" in which he indicated that Kaumans was temporary disabled from July 23, 2010 through January 23, 2011 because of major depression. Id.  Dr. Coronado further stated that his assessment was based on review of medical records and a clinical history. Id.   On August 3 and September 14, 2010, Dr. Coronado indicated that Kaumans was suffering from severe depression and continued Kaumans's antidepressant medication. Tr. 356-357.

**DISCUSSION**

The administrative law judge at step one of the sequential evaluation process found that Kaumans has not engaged in substantial gainful activity since April 30, 2009,  the alleged disability onset date. Tr. 12.

At step two, the administrative law judge found that Kaumans suffers from the

---

Counseling will be able to provide you with the information that you have requested." Tr. 360. The records submitted by Adams-Hanover, however,  do not contain Ms. LaMendola's therapy records and the Social Security Administration did not after receiving the records from Adams-Hanover re-contact Ms. LaMendola.

following severe impairments: "hypertension, diabetes mellitus with peripheral neuropathy, depression and history of learning disability." Id.

At step three, the administrative law judge found that Kaumans does not have an impairment or combination of impairments which meet or medically equal one of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1. Id. As part of the step three analysis the administrative law judge found that Kaumans had moderate difficulties with social functioning and with respect to concentration, persistence and pace. Tr. 13.

At step four, the administrative law judge found Kaumans could not perform his prior relevant medium and very heavy work but had the residual functional capacity to perform a range of simple, unskilled light work "in that he is able to stand/walk 2 hours per day; sit for 6 or more hours per day with the need for a sit/stand option; and perform occasional climbing, balancing, stooping, kneeling, crouching, and crawling." Tr. 14. The administrative law judge further provided that Kaumans "is limited to only simple, repetitive tasks; only occasional changes in the work setting; and only occasional interaction with supervisors, coworkers, or public." Id. In so finding the administrative law judge rejected the opinions of Kaumans's treating physicians and the opinion of Dr. Nolt, who examined Kaumans on behalf of the Bureau of Disability Determination and found that Kaumans could only stand and walk 1 hour or less during an 8-hour workday and never stoop, crouch, balance or climb. With respect to Dr. Nolt's opinion that Kaumans could only stand and walk 1 hour or less during and 8-hour day and never stoop, crouch, balance or climb, the administrative law judge in rejecting that opinion did not point to any contrary medical opinion. He merely engaged in his own lay analysis of the medical records.

During the hearing on June 8, 2010, the administrative law judge took

testimony from a vocational expert to determine whether or not jobs exist in the economy for an individual of Kaumans's age, education, work experience, and the above described residual functional capacity. The vocational expert testified that Kaumans could perform the unskilled jobs of small products assembler, electrical accessory assembler, and production assembler, and that there were a significant numbers of such jobs in the regional and national economies. Tr. 44-45.

At step five, the administrative law judge concluded that Kaumans was not disabled because he could perform the jobs identified by the vocational expert. Tr. 19.

Kaumans makes several arguments including that the ALJ did not adequately develop the record and did not account for all of Kaumans's credibly established limitations in the hypothetical question asked of the vocational expert, particularly Kaumans's moderate limitation with respect to concentration, persistence and pace. We find substantial merit in those arguments.

During the administrative hearing held on January 3, 2011, Kaumans informed the administrative law judge that he had recent medical treatment and that there were other medical records that were not submitted. Tr. 28-29. The administrative law judge prior to taking the testimony of Kaumans and the vocational expert informed Kaumans who was not represented by counsel that he would not make a decision until he received all of the records. Tr. 29. At the end of the hearing the administrative law judge again informed Kaumans that he would take steps to obtain the additional medical records. Tr. 45-46. In his decision dated March 7, 2010, the administrative law judge states as follows: "I left the record open and requested these records. However, the only information sent was the initial evaluation dated January 15, 2010, which was already in the file." Tr. 14-15. A review of

the administrative record does not reveal the actual steps taken by the ALJ to obtain any additional medical records, including who he sent the request to or what he requested. Furthermore, it does not indicate that he informed Kaumans prior to issuing a decision of the fact that no further records were obtained.

After Kaumans obtained counsel and filed an action in this court, counsel for Kaumans obtained the additional medical records and attached them to his brief. The records consist of an evaluation performed at Adams-Hanover on November 9, 2009, and therapy/treatment records from November 2 and December 21, 2010. The evaluation of November 9, 2009, reveals that Kaumans was diagnosed as suffering from major depressive disorder, single episode, severe without psychotic features (DSM Code 296.23); anxiety disorder, not otherwise specified (DSM Code 300.00); and rule out dysthymia. Kaumans was given a GAF score of 45, representing serious symptoms. The evaluation was signed by the therapist Robert A. Sette on November 9, 2009, and a psychiatrist on December 12, 2009. The therapy/treatment record dated November 2, 2010, was signed by therapist Sette and appears to have been signed by a psychiatrist. That records reveals that Kaumans was suffering from major depressive disorder. The therapy/treatment record from December 21, 2010, was signed by Dr. Coronado and states that Kaumans was suffering from major depressive disorder. There is no indication that the ALJ after the administrative hearing took steps to obtain a mental residual functional capacity assessment from Dr. Coronado or therapist Sette which would have been appropriate in light of Kaumans's unrepresented status.

The administrative law judge failed adequately to develop the record. The primary reason for remanding this case is that failure. As one court has correctly stated

> [a] proceeding will be marked by unfairness when the ALJ fails to exercise his or her duty to fully develop the record prior to making a disability determination. When a claimant is unrepresented in social security proceedings, the ALJ has a heightened duty to assist the claimant in developing a full and fair record. Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir.2003). When a claimant appears at a hearing without counsel, the ALJ must scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts. The adequacy of an ALJ's investigation will be determined on a case-by-case basis. The essential inquiry is whether the incomplete record reveals evidentiary gaps [that] result in prejudice to the claimant.

Rosenberger v. Commissioner of Social Security, 2009 WL 3124754 (W.D. Pa 2009)(citations and quotations marks omitted).

This is a case where it is obvious that the record was not adequately developed. At the hearing the administrative law judge was made aware of other medical records. However, the record fails to reveal what steps he took to obtain those medical records and he did not give Kaumans's an opportunity to supplement the record.

There was no attempt by the administrative law judge to obtain an assessment from Kaumans's treating physicians regarding Kaumans's mental functional capacity. The administrative law judge had a responsibility to investigate the facts and develop the arguments both for and against granting benefits. See Kinney v. Astrue, Civil No. 10-104, slip op. at 52 (M.D. Pa. July 27, 2010)(Doc. 11)(Muir, J.). In this case he did not fulfill that responsibility. The ALJ did not fulfill his duty to ensure he issued a decision based upon a fully developed record.

Kaumans argues that the failure to include a moderate limitation in concentration, persistence and pace in the hypothetical question asked of the vocational expert is an error warranting remand for a new hearing. Cases from this circuit support Kaumans's position. The Court of Appeals for the Third has held that if an administrative law

judge poses a hypothetical question to a vocational expert that fails to reflect all of the applicant's impairments that are supported by the record, the vocational expert's opinion cannot be considered substantial evidence. Ramirez v. Barnhart, 373 F.3d 546, 552-553 (3d Cir. 2004); see also Corona v. Barnhart, 431 F.Supp.2d 506, 516 (E.D.Pa. 2006)("the ALJ's determination that Plaintiff suffers mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning and moderate difficulties in maintaining concentration is not properly reflected in her hypothetical question to the VE."); Warfle v. Astrue, Civil No. 10-1255, slip op. at 20 (M.D. Pa. May 5, 2011)(Muir, J.)("It is incumbent on the administrative law judge to include in a hypothetical question all the limitations that are supported by the records."); Little v. Astrue, Civil No. 10-1626, slip op. at 18-19 (M.D.Pa. September 14, 2011)(Kosik, J.)(same).    Although the administrative law judge limited Kaumans to simple, unskilled work, this does not adequately reflect a moderate  limitation in concentration, persistence or pace. Id.  There are clearly many unskilled jobs that require an employee to maintain concentration, persistence and pace.  There is no evidence in the record from a vocational expert that a moderate limitation in those areas would not impact Kaumans's ability to maintain employment as a small products assembler, electrical accessory assembler, and production assembler.  We can only speculate as to what the erosion in the number of jobs available would have been if a moderate limitation in concentration, persistence or pace would have been included in the hypothetical question.[31]

---

[31] It is also important to mention that at step five of the sequential evaluation process the burden is on the Commissioner to produce evidence demonstrating that other work exists in significant numbers in the national economy that the applicant can perform. 20 C.F.R. §§ 404.1512 and 404.1560.

In addition to the error when questioning the vocational expert, the Social Security regulations contemplate the administrative law judge considering whether there are any medically determinable impairments and then when setting a claimant's residual functional capacity considering the symptoms of both medically determinable severe and non-severe impairments. 20 C.F.R. § 404.1529. The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no impairment or combination of impairments which significantly limit the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. § 404.1520(d)-(g). A failure to find a medical condition severe at step two will not render a decision defective if some other medical condition was found severe at step two. However, all of the medically determinable impairments both severe and non-severe must be considered at step four when setting the residual functional capacity. The social security regulations mandate such consideration and this court has repeatedly so indicated. See, e.g., Christenson v. Astrue, Civil No. 10-1192, slip op. at 12 (M.D. Pa. May 18, 2011)(Muir, J.); Little v. Astrue, Civil No. 10-1626, slip op. at 19-21 (M.D.Pa. September 14, 2011)(Kosik, J.); Crayton v. Astrue, Civil No. 10-1265, slip op. at 32-35 (M.D.Pa. September 27, 2011)(Caputo, J.); 20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and 416.945(a)(2).

The additional records attached to Kaumans's brief reveal that Kaumans suffered from an anxiety disorder in addition to depression. This is one more reason why the ALJ's failure to develop the record calls for a remand of the case to the Commissioner for further proceedings.

Kaumans also argues that the ALJ did not evaluate properly the medical opinions. We agree. Dr. Sullivan, one of Kaumans's treating physicians, on December 22, 2010, provided a physical residual functional capacity assessment which limited Kaumans to less than full-time work. The ALJ purports to rely on Dr. Nolts's assessment of February 3, 2010, but rejects several of Dr. Nolts's findings which are similar to the findings of Dr. Sullivan, e.g., Kaumans could never stoop, crouch, balance or climb.

The administrative law judge rejected the opinion of Dr. Sullivan. The preference for the treating physician's opinion has been recognized by the Court of Appeals for the Third Circuit and by all of the federal circuits. See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000). When the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the administrative law judge may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason." Id. In choosing to reject the evaluation of a treating physician, an administrative law judge may not make speculative inferences from medical reports and may reject treating physician's opinions outright only on the basis of contradictory medical evidence. Id. An administrative law judge may not reject a written medical opinion of a treating physician based on his or her own credibility judgments, speculation or lay opinion. Id. An administrative law judge may not disregard the medical opinion of a treating physician based solely on his or her own "amorphous impressions, gleaned from the record and from his evaluation of the [claimant]'s credibility." Id. As one court has stated, "Judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor" because "lay intuitions about medical phenomena are often wrong." Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir 1990).

In rejecting Dr. Sullivan's opinion the administrative law judge did not point to any contrary medical opinion which supported his physical residual functional capacity assessment but engaged in his own lay analysis of the medical records and accepted some of Dr. Nolts's findings and rejected others. The administrative law judge failed to give an adequate reason for rejecting the opinion of Dr. Sullivan. In setting the residual functional capacity at light work, the administrative law judge did not point to any functional assessment performed by a treating physician or a physician who examined Kaumans or reviewed the medical records which was consistent with his determination. Instead, he engaged in his own lay analysis of the bare medical records and picked and choosed some of Dr. Nolts's findings. There is a lack of substantial evidence supporting the administrative law judge's residual functional capacity assessment and rejection of Dr. Sullivan's opinion.

We recognize that the residual functional capacity assessment must be based on a consideration of all the evidence in the record, including the testimony of the claimant regarding his activities of daily living, medical records, lay evidence and evidence of pain. See Burnett v. Commissioner of Social Sec. Admin., 220 F.3d 112, 121-122 (3d Cir 2000). However, rarely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant. See Doak v. Heckler, 790 F.2d 26, 29 (3d Cir.1986)("No physician suggested that the activity Doak could perform was consistent with the definition of light work set forth in the regulations, and therefore the ALJ's conclusion that he could is not supported by substantial evidence."); 20 C.F.R. § 404.1545(a). As two commentators have explained:

> Sometimes administrative law judges assert that they -
> and not physicians - have the right to make residual
> functional capacity determinations. In fact, it can

reasonably be asserted that the ALJ has the right to determine whether a claimant can engage in sedentary, light, medium, or heavy work. The ALJ should not assume that physicians know the Social Security Administration's definitions of those terms. <u>However, the underlying determination is a medical determination, i.e., that the claimant can lift five, 20, 50, or 100 pounds, and can stand for 30 minutes, two hours, six hours, or eight hours. That determination must be made by a doctor. Once the doctor has determined how long the claimant can sit, stand or walk, and how much weight the claimant can lift and carry, then the ALJ, with the aid of a vocational expert if necessary, can translate that medical determination into a residual functional capacity determination.</u> Of course, in such a situation a residual functional capacity determination is merely a mechanical determination, because the regulations clearly and explicitly define the various types of work that can be performed by claimants, based upon their physical capacities.

Carolyn A. Kubitschek & Jon C. Dubin, Social Security Disability Law and Procedure in Federal Courts, 287-88 (2011)(emphasis added); <u>see</u> <u>also</u> <u>Woodford v. Apfel</u>, 93 F.Supp.2d 521, 529 (S.D.N.Y. 2000)("An ALJ commits legal error when he makes a residual functional capacity determination based on medical reports that do not specifically explain the scope of claimant's work-related capabilities."); <u>Zorilla v. Chater</u>, 915 F.Supp. 662, 667 (S.D.N.Y. 1996)("The lay evaluation of an ALJ is not sufficient evidence of the claimant's work capacity; an explanation of the claimant's functional capacity from a doctor is required."). The administrative law judge cannot speculate as to a claimant's residual functional capacity but must have medical evidence, and generally a medical opinion regarding the functional capabilities of the claimant, supporting his determination. <u>Id.</u>

In this case there was no assessment of the physical functional capabilities of Kaumans from a physician which supported the administrative law judge's residual functional

capacity assessment  and the bare medical records and other non-medical evidence were insufficient for the administrative law judge to conclude that Kaumans had the residual functional capacity to engage in  light work on a full-time basis.

Our review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence.  We will, therefore, pursuant to 42 U.S.C. § 405(g) vacate the decision of the Commissioner and remand the case for further proceedings.

An appropriate order will be entered.


s/A. Richard Caputo
A. RICHARD CAPUTO
United States District Judge


Dated: November 19, 2012